IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 15, 2006 Session

## JAMES EDWARD WILLIAMS v. BRENT R. WATSON, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-214-05     Harold Wimberly, Judge**

---

**No. E2005-02403-COA-R3-CV - FILED JANUARY 25, 2007**

---

James Edward Williams and Gladys Pineda Williams were divorced on December 13, 2004, following a very contentious proceeding in the Chancery Court of Knox County. Mr. Williams filed the action at bar against his former attorneys and also against attorneys representing his former wife. He alleges against these attorneys various acts of tortious activities, malpractice and violation of the Tennessee Consumer Protection Act. The trial court dismissed all of his claims, and Mr. Williams appeals. We affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Mary Ann Reese and Thomas F. Bloom, Nashville, Tennessee, for the appellant, James Edward Williams.

Darryl G. Lowe, Knoxville, Tennessee, for the appellees, John K. Harber, Robert E. Pryor, Sr., Timothy A. Priest, and the law firm of Pryor, Flynn, Priest & Harber.

Linda J. Hamilton Mowles, Knoxville, Tennessee, for the appellees, Brent R. Watson, Norman D. McKellar, Suzanne Nicole Price,, Nick D. Bunstine, Louis Andrew McElroy, II, and the law firm of Bunstine, Watson & McElroy.

### OPINION

Mrs. Williams commenced a divorce action on December 3, 2003, represented by Norman McKellar from the firm of Bunstine, Watson and McElroy. Mr. Williams employed his own counsel, John Harber, of the firm of Pryor, Flynn, Priest and Harber. After very contentious proceedings marked by much acrimony and legal maneuvering, a Final Decree of Divorce was entered December 13, 2004, approving a property settlement and permanent parenting plan.

Dissatisfied by the actions of all counsel in the divorce case, Mr. Williams filed the Complaint at bar on April 14, 2005. Against his own former counsel, John Harber, and the firm of Pryor, Flynn, Priest and Harber, he asserts first that Mr. Harber misrepresented to him the record title to property located in Echo Valley. His assertion is that Mr. Harber advised him that the Echo Valley property was titled in the joint names of husband and wife, when in fact Williams had purchased the property in his name alone. Based upon this assertion, he claims that had he known the true record title to the Echo Valley property, he could have gained a more favorable property settlement.

Mr. Williams next asserts that after Mr. Harber had been discharged by him on August 18, 2004, he signed a consent order on October 15, 2004, which was entered "*nunc prop tunc* 7-9-04." Williams claims that this order obligated him to pay the "monthly mortgage payment on Mother's residence in the amount of . . . Eleven Hundred Eighty-five ($1,185); . . . child care expenses to La Petite Academy of . . . $600; and Mother's home maintenance and landscaping expenses which vary in monthly amount." Williams' last claim against Harber is that he entered into a civil conspiracy with Price and Watson who were representing Mrs. Williams at the time of the *nunc pro tunc* order since Norman D. McKellar had previously withdrawn from Bunstein, Watson and McElroy.

On May 6, 2005, Harber filed a Motion to Dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6) for failure to state a claim upon which relief may be granted. The Motion to Dismiss asserted that the Complaint failed to allege any factual basis to support breach of a duty, which was cause in fact or proximate cause of specific damages. As to the civil conspiracy complaint, the Motion asserted a failure to allege a combination of two or more persons to accomplish by concert an unlawful purpose or a purpose not itself unlawful, but accomplished by unlawful means.

On September 16, 2005, the trial judge entered an order dismissing all claims against Defendant Harber.

The standard of review on appeal from a trial court order granting a motion to dismiss under Tennessee Rule of Civil Procedure 12.02(6) for failure to state a claim upon which relief may be granted is undisputed.

> A motion to dismiss for failure to state a claim upon which relief can be granted is the equivalent of a demurrer under our former common law procedure. *Cornpropst v. Sloan*, 528 S.W.2d 188, 190 (Tenn.1975). Such a motion admits the truth of all relevant and material averments in the complaint but asserts that such facts cannot constitute a cause of action. *Id.* In considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the court should construe the complaint liberally in favor of the plaintiff taking all of the allegations of fact therein as true. *Humphries v. West End Terrace, Inc.*, 795 S.W.2d 128, 130 (Tenn.Ct.App.1990). A complaint should not be dismissed upon such a motion " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of [the] claim that would entitle [the plaintiff] to relief' ". *Id.* (quoting *Fuerst v. Methodist Hosp. South*, 566 S.W.2d 847, 848 (Tenn.1978)).

*McGee v. Best*, 106 S.W.3d 48, 61-62 (Tenn.Ct.App.2002).

The assertion that Mr. Harber misrepresented to Mr. Williams the record title to the Echo Valley property which he had purchased in his own name prior to marriage, even if such assertion be true, states no cause of action. In a divorce case, classification of property does not depend on the state of its record title. *Jones v. Jones*, 597 S.W.2d 886 (Tenn.1979); *Mondelli v. Howard*, 780 S.W.2d 769, 774 (Tenn.Ct.App.1989); *Trimble v. Trimble*, 458 S.W.2d 794 (Tenn.1970). The assertion that the record title to property involved in a divorce proceeding is binding on the court in a divorce proceeding has been refuted by this Court.

> This argument overlooks the important principle that the classification of property does not depend on the state of its record title but on the conduct of the parties. *Mondelli v. Howard*, 780 S.W.2d 769, 774 (Tenn.Ct.App.1989). Thus, the courts will consider all the parties' legal and equitable interests in property when they are called upon to divide the marital estate. *Jones v. Jones*, 597 S.W.2d 886 (Tenn.1979).

*Altman v. Altman*, 181 S.W.3d 676, 680-81 (Tenn.Ct.App.2005).

The Final Divorce Decree with the agreed settlement as to property rights was entered December 13, 2004, almost four (4) months after Mr. Harber had been discharged by Mr. Williams, and he was represented by counsel presumably aware that the record title to the Echo Valley Property was not significant.

In determining the significance of the *nunc pro tunc* order of October 15, 2004, the chronology of events is important. On April 7, 2004, Mrs. Williams filed her Motion for *Pendente Lite* Support. No hearing on this Motion was held since Mr. Williams paid support for his wife and son. On June 18, 2004, Mr. Williams swore in answer to an interrogatory:

> As support to both the plaintiff (Mrs. Williams) and our son, I pay her monthly mortgage payment in the amount of $1,185.00, monthly child care expenses to La Petite Academy in the amount of $600.00, as well as plaintiff's home maintenance and landscaping expenses which vary in monthly amount.

He had previously sworn on May 21, 2004, in his Affidavit of Average Monthly Income and Expenses, that he was paying his wife's monthly mortgage in the amount of $1,185 and that he was paying his son's child care expenses in the amount of $559 per month.

While Mr. Harber was still representing Mr. Williams, a hearing was held on July 9, 2004 before the child support referee wherein an agreement was announced by all parties that the

temporary child support obligation of Mr. Williams would be satisfied by paying the mother's monthly mortgage payment of $1,185, monthly child care expenses to La Petite Academy in the amount of $600 and the mother's home maintenance and landscaping expenses which varied in amount. For some reason unexplained in the record, the order reflecting the July 9, 2004, agreement was not timely entered, but it is noted that the agreement exactly conforms to the amounts that Mr. Williams swore that he was paying as of May 21, 2004, and June 18, 2004.

Mr. Harber was discharged by Mr. Williams on August 18, 2004. Thereafter, when counsel for Mrs. Williams became aware that the order reflecting the July 9, 2004, agreement had not been entered, he contacted Mr. Harber who forwarded the order to the court, and the order was entered on October 15, 2004, *nunc pro tunc*, as and for July 9, 2004. How this *nunc pro tunc* order reflecting exactly what Mr. Williams had been previously paying as temporary support and child care expenses adversely affects him is difficult to imagine. Any results emanating from the *nunc pro tunc* order are exactly the same results as predated the *nunc pro tunc* order. No material variance exists between the July 9, 2004 agreement and the October 14, 2004 order, and therefore no cause of action is stated. *Spalding v. Davis*, 674 S.W.2d 710, 714-15 (Tenn.1984).

The allegations of civil conspiracy relating to Mr. Harber involve this same *nunc pro tunc* order entered October 15, 2004, requiring Mr. Williams to pay what he was already obligated to pay. The allegations of conspiracy are all but indecipherable and assert no concert of action between the Defendant Harber and opposing counsel that was either unlawful or was accomplished by unlawful means.

The action of the trial court in granting the Motion to Dismiss by Defendants John K. Harber, Richard E. Pryor, Sr., Timothy A. Priest and the law firm of Pryor, Flynn, Priest and Harber is affirmed.

The Complaint by Williams against Bunstine, Watson & McElroy asserts two primary complaints. The first complaint concerns Norman D. McKellar at the time he was representing Mrs. Williams in the divorce case. The second complaint concerns the alleged actions of Brent R. Watson and Suzanne Nicole Price after McKerr's departure from the firm.

The Complaint alleges:

12. On or about April 19, 2004, McKellar did intentionally, fraudulently, willfully, negligently, recklessly, and/or with a conscious indifference and/or with malice, unfairly and with deception did cause a letter and accompanying document purporting to be a legal prohibition keeping Mr. Williams from picking up his three-year old son from his daycare or from visiting with his little son without supervision, to be faxed to the La Petite Academy where his small son was enrolled.

13. The Director of La Petite Academy ("Director") thereupon called McKellar to verify her belief that his correspondence and his accompanying

document was a restraining order prohibiting Mr. Williams from continuing with his routine practice of removing his son from daycare for visitation. Despite the Director's protestations to McKellar that Mr. Williams was a good father who took an interest in his son, McKellar confirmed that a restraining order had been issued against Mr. Williams and was adamant that Mr. Williams could not remove the child form daycare; and, if Mr. Williams visited with his child at daycare, he must be supervised.

14. When Mr. Williams arrived later that day to take his son for visitation, the Director apologetically advised that he could neither remove his son nor be alone with him. Upon hearing this prohibition, Mr. Williams, a former heart-surgery patient, believing he had been accused of some vile behavior against his small son and only child and that he was being prohibited from visitation, immediately experienced chest and back pain, shortness of breath, chill sensations, and heart palpitations.

15. Mr. Williams then asked the Director if there was a court order or injunction; and she advised him that there was; and upon Mr. Williams' request she furnished to him the faxed document from McKellar.

16. Upon examination, Mr. Williams perceived that the purported restraining order was a proposed parenting plan; and although a notary acknowledgment appeared thereon, there was no signature of any judge. Mr. Williams pointed this out to the Director and asked for the immediate possession of his son.

17. Upon the Director's request to again telephone McKellar, Mr. Williams acquiesced. McKellar in the subsequent telephone conversation with the Director continued to vigorously object to the removal of the child from La Petite, and further advised that it was an order which would be effective within the week. The Director (recognizing that she had been deceived) admonished McKeller and advised there was no judge's signature on the document he had faxed to her and that the child would be released to Mr. Williams for visitation. In response McKeller demanded specific details of Mr. Williams' plans that day with his son. The Director responded that it was none of his business, terminated the conversation with McKellar, and apologized to Mr. Williams, who was then able to leave the premises with his son.

Various other conclusory allegations are made relative to Watson McKellar & Price asserting various complaints about the manner in which these attorneys represented his former wife in the divorce action.

The defendants from the firm of Bunstine, Watson & McElroy and Norman D. McKellar on July 11, 2005 filed a Motion to Dismiss under Rule 12.02(6) of the Tennessee Rules of Civil

Procedure or alternatively for summary judgment. On September 16, 2005, the trial court entered an order Dismissing with Prejudice all claims against these defendants.

Because the Motion to Dismiss filed by these defendants contained extraneous material in the form of an affidavit from Defendant McKellar and a Statement of Undisputed Facts, the Motion is converted to a Motion for Summary Judgment.

> If, on a motion asserting the defense numbered (6) to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the Motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."

Tenn.R.Civ.P. 12.02.

Mr. Williams countered with his own affidavit and the affidavit of Barbara Cochran, the Director of La Petite Academy. When the Complaint in respect to La Petite Academy is considered in the light of the affidavits of McKellar, Williams and Cochran, no cause of action is stated against these defendants. The proof shows without question that April 7, 2004, McKellar called Cochran at La Petite and then faxed to her a letter enclosing a proposed parenting plan and a proposed order approving same. Mr. Williams departed for Florida while his son remained at La Petite Academy. When he returned, and on April 19, 2004, sought to visit his son at the Academy, the events charged in the Complaint occurred. First, Williams asserts that on April 19, 2004, McKellar "did cause a letter and accompanying document purporting to be a legal prohibition keeping Mr. Williams from picking up his three-year old son from his daycare. . . to be faxed to the La Petite Academy." This allegation does not conform to the affidavit of Barbara Cochran who says:

> In 2004 I was the director of La Petite Academy, a daycare center in Knoxville, Tennessee, where Gladys and Jim Williams had enrolled their son for daycare. Approximately two weeks prior to April 19, 2004, I received a telephone call from Norman McKellar, who represented himself as Gladys Williams' attorney. He stated that a restraining order was to issue against Mr. Williams, and I asked him to fax me a copy of any restraining order. On the morning of April 19, 2004, I learned that Mr. Williams was coming to daycare to take his son for visitation, either by Mrs. Williams when she dropped their child off or by notification of Mr. Williams as was customary. I then called Mr. McKellar to confirm that there was a restraining Order against Mr. Williams. Mr. McKellar stated that there was and that Mr. Williams was prohibited from taking his son from the daycare premises or from visiting with him on premises without supervision. I was extremely upset that I would have to relay Mr. McKellar's message about the restraining order and indeed worried about it until Mr. Williams got there that morning. Lee Stazzone and myself were present when Mr. Williams arrived at the daycare.

When he asked for his son, I related to him what Mr. McKellar had told me as set out above. Mr. Williams immediately began to exhibit visual signs of physical distress, so much so that I thought he was having a heart attack. Mr. Williams asked me if I had a copy of the order and I retrieved a document from the file and showed it to Mr. Williams. He reviewed the document and pointed out to me that [it] contained no judge's signature and only contained words relating to a parenting plan. When he insisted that he was taking his son for visitation, I asked him if Mr. McKellar could be contacted first and Mr. Williams assented. During the telephone conversation with Mr. McKellar, it was pointed out there was no judge's signature on the document and only indicated a parenting plan. Mr. McKellar advised that it was not yet a restraining order. I chastised Mr. McKellar for misleading me and for involving daycare. I further advised him that Mr. Williams was taking his son for visitation, after which Mr. McKellar wanted to know Mr. William's plans. I told him it was none of his business and hung up the phone. I apologized to Mr. Williams and he left the premises with his son.

It does appear from the affidavit of Ms. Cochran that no documents were sent to her on April 19, 2004, but in fact, the documents at issue are the proposed parenting plan and order forwarded to her on April 7, 2004, by Mr. McKellar (or as per her affidavit, "approximately two weeks prior to April 19, 2004").

On July 11, 2005, the Price, Bunstine, Watson and McElroy defendants filed a Statement of Undisputed Material Facts pursuant to Tennessee Rules of Civil Procedure 56.03. This Statement asserted:

1. In late fall 2003, James Edward Williams and his wife, Gladys Williams, agreed to obtain a divorce. Complaint ¶11.
2. In December 2003, Norman McKellar filed a divorce complaint on behalf of Gladys Williams. Complaint ¶11
3. The complaint alleged that, at the time it was filed, Mr. and Mrs. Williams had joint custody of their child. Complaint, ¶11.
4. On April 7, 2004, Norman McKellar returned a telephone call to his client, Gladys Williams. Norman McKellar Affidavit. ¶4.
5. Ms. Williams told Norman McKellar she had information that her husband James Williams was going to pick up their two-year-old son from his daycare, La Petite Academy, and take him to Florida for two weeks. Norman McKellar Affidavit, ¶4.
6. As an advocate for his client, Gladys Williams, in the ongoing divorce case, Norman McKellar called Barbara Cochran at La Petite Academy and informed her that his client, Gladys Williams, did not want her husband to take the child from the daycare center because he had indicated he planned to take the child to Florida for two weeks. Ms. Cochran asked if there was a court order or parenting plan prohibiting Mr. Williams from taking his son. Mr. McKellar told her that there was

no such order or plan. He told her a proposed parenting plan had been submitted to the court but had not been signed by the judge and was not in effect. Ms. Cochran asked Mr. McKellar to fax the proposed parenting plan to her attention. Norman McKellar Affidavit, ¶6.

7. On April 7, 2004, Mr. McKellar faxed the proposed parenting plan to Ms. Cochran along with a letter. Norman McKellar Affidavit, ¶7. His fax machine generated a fax document indicating the fax was received. Norman McKellar Affidavit, ¶6. The letter dated April 7, 2004, said:

> As I mentioned to you during our telephone conversation today, I represent Gladys Williams in her pending divorce against Jim Williams. I have attached a copy of our Proposed Temporary Parenting Plan for your review.
>
> My client does not consent to allowing her son, Tommy, to go to Florida with Mr. Williams. We hope and expect that you will honor my client's wishes.
>
> Should you have any questions or concerns regarding this matter, please do not hesitate to contact me.
>
> Norman McKellar Affidavit, ¶12, Exhibit 1.

The parenting plan enclosed in the letter was clearly titled, in bold fact type, **"THE PLAINTIFF'S PROPOSED TEMPORARY PARENTING PLAN."** It was identified as a temporary plan in the text of the letter, and it was obviously not signed by a judge. Norman McKellar Affidavit, ¶12, Exhibit 1.

8. The letter dated April 7, 2004, the proposed parenting plan enclosed in the letter, the fax confirmation indicating delivery of the fax to La Petite, and the fax cover sheet and fax transmittal confirmation indicating delivery of the fax to John Harber, are attached to Mr. McKellar's affidavit as collective Exhibit 1. Norman McKellar Affidavit, ¶12.

9. At no time did Norman McKellar tell Ms. Cochran or anyone else at La Petite that there was a restraining order prohibiting Mr. Williams from removing his son from the daycare center. What he told Ms. Cochran was that Gladys Williams had information that Mr. Williams intended to take the child to Florida for a period of two weeks, that Gladys Williams did not want him to do so, and that they wanted her cooperation in prohibiting the child from being taken from the daycare by Mr. Williams. Norman McKellar Affidavit, ¶10.

10. Mr. McKellar did not conceal his communication with La Petite. He called Mr. Williams' attorney, John Harber, on April 7, 2004, to advise him of the communication with La Petite, and he sent Mr. Harber a copy of the April 7, 2004 letter to La Petite by fax. Norman McKellar Affidavit, ¶11.

11. On the same day the letter was sent, Mr. Williams arrived at La Petite to take his son. The director of La Petite told him apologetically that he could not remove his son from the premises to be alone with him. Complaint, ¶14.

12. Mr. Williams alleges that he thought he was being accused of some vile behavior against his son. He claims to have immediately experienced chest and back pain, shortness of breath, chill sensations, and heart palpations. Complaint, ¶14.

13. Mr. Williams asked the La Petite director if there was a court order or injunction. She told him there was and showed him the documents faxed by Mr. McKellar. Complaint, ¶15.

14. Mr. Williams immediately recognized that what the director of La Petite thought was a court order was a proposed parenting plan that had not been signed by the judge. Complaint, ¶16.

15. The director of La Petite again called Mr. McKellar. Mr. McKellar continued to vigorously object to the removal of the child from La Petite and said the parenting plan would be effective within the week. The director then allowed Mr. Williams to leave the La Petite premises with his son. Complaint, ¶17.

16. Mr. Williams alleges that he continued to suffer symptoms indicative of a heart attack. He returned his son to La Petite after a short visit. The La Petite personnel were concerned about Mr. Williams and called an ambulance to go to his home. Complaint, ¶18.

17. Mr. Williams alleges that Mr. McKellar knew Mr. Williams had a heart condition. Complaint, ¶20.

18. At the end of May 2004, Mr. McKellar left the office of Bunstine, Watson & McElroy to open a new office, and thereafter Nicole Price and Brent Watson of Bunstine, Watson & McElroy assumed handling of the file. Norman McKellar Affidavit, ¶3.

19. Nicole Price and Brent Watson represented Gladys Pineda Williams in the above mentioned divorce case, *Gladys Pineda Williams v. James Edward Williams*, Knox County Chancery Court No. 159867-2, from around the end of May 2004, after Mrs. Williams' original attorney, Norman McKellar, left Bunstine, Watson & McElroy. James Edward Williams was initially represented by attorney John Harber. Price Affidavit, ¶14.

20. Prior to a hearing scheduled before the Referee on July 9, 2004, on Gladys Williams' motion for child support *pendente lite*, Mr. Harber and Ms. Price reached an agreement on behalf of both Mr. and Mrs. Williams, that being that James Williams would continue paying the mortgage payment on the house where Mrs. Williams and the parties' minor son were living, maintenance expenses on the house where Mrs. Williams was living, and daycare expenses for the parties' minor child, all in lieu of a formal payment of child support. Ms. Price and Mr. Harber contacted the Referee's office and informed her that an agreement had been reached regarding child support, that an agreed order would be forthcoming, and that the hearing scheduled for July 9, 2004, could be removed form the docket. Price Affidavit, ¶5.

21. Mr. Harber prepared and sent to Ms. Price for approval on July 6, 2004, a draft of the order memorializing the agreement regarding child support. By oversight, the order was not submitted to the court for entry. Ms. Price did not realize it had not been entered until around mid-October 2004, when she began preparation of a petition for contempt due to Mr. Williams' failure to make the agreed payments. Price Affidavit, ¶6.

22. When Ms. Price realized in mid-October, 2004 that the order had not been entered with the court, she contacted Mr. Harber, who submitted the signed order to the court for entry *nunc pro tunc*. Price Affidavit, ¶7.

23. After the order was entered *nunc pro tunc*. as of July 9, 2004, Ms. Price proceeded with the petition for contempt which was filed on October 20, 2004. A copy of the July 9, 2004 order is attached as Exhibit 1. Price Affidavit, ¶8.

24. No hearing was held on the petition for contempt. The case was settled, and a marital dissolution agreement was entered on December 13, 2004. A permanent parenting plan was signed by the parties and approved by the court on the same date. A final judgment of divorce was also entered on December 13, 2004, granting a divorce on the grounds of irreconcilable differences. True and exact copies of the marital dissolution agreement, permanent parenting plan and final decree of divorce are attached as Exhibits 2, 3 and 4. Price Affidavit, ¶9.

25. Neither Nicole Price, nor any other attorney at Bunstine, Watson & McElroy, had any plan or agreement with Mr. Harber, Norman McKellar, or any other person to take any unlawful action against James Williams. Additionally, Ms. Price and the other attorneys at Bunstine, Watson & McElroy did not have any plan or agreement to take any lawful action against Mr. Williams to achieve an unlawful result. All actions taken were lawful and done in the representation of their client, Gladys Pineda Williams. Price Affidavit, ¶10.

Three days prior to the hearing on September 2, 2005, Plaintiff filed a purported response to this Statement of Undisputed Facts, which evidences no material factual dispute but is simply a brief reasserting the allegations of the Complaint and pointing out nothing in the record establishing disputes of material fact. This August 29, 2005, Response to the defendant's Statement of Undisputed Facts states in part:

None of the defendants filed an answer to the complaint. Mr. Benner's presentation of "undisputed facts" are disputed by the plaintiff where not mirrored in the complaint filed on Plaintiff's behalf and/or substantiated or corrected by affidavits filed in support of Mr. Williams' contentions and in opposition to the motions of the defendants. Further, in some instances, Mr. Benner merely states "allegations" rather than relying on any admitted fact.

. . .

Facts of this case are further set out in the affidavits filed in support of Mr. Williams' opposition to motions to dismiss or summary judgment and are incorporated herein by reference.

All that follows this recitation is simply a brief arguing the allegations of the Complaint.

The requirements of Tennessee Rule of Civil Procedure 56.03 are mandatory, and it is not the duty of the court, trial or appellate, to search the record in order to find a material dispute of fact. This Court has held:

> The plaintiff argues that the trial court erred in applying Tenn. R. Civ. P. 56.03 in an "unjustifiably mechanistic fashion" when it refused to consider evidence contained in the discovery materials filed by the plaintiff but not referred to in his Rule 56.03 response to the defendant's statement of material facts. The plaintiff insists that "he could have created a genuine question of material fact ⋯ had the Trial Judge not excluded large portions of his evidence." The plaintiff contends that the trial court's action was especially unwarranted in light of the fact that the memorandum of law filed along with his response contains a concise statement of all of the facts relied upon by the plaintiff, along with appropriate citations to the record. At the very least, the plaintiff contends, he should have been granted a continuance to allow him time "to configure his documents into the Court's preferred format."
>
> Rule 56.03 requires the party seeking summary judgment to provide "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. Each fact must be set forth in a separate, numbered paragraph along with a specific citation to the record. *Id.* The nonmoving party must file a response to each fact set forth by the moving party and either (1) agree that the fact is undisputed; (2) agree that the fact is undisputed for the purposes of the motion; or (3) demonstrate with a specific citation to the record that the fact is disputed. *Id.* Rule 56.03 further provides
>
>> the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.
>
> *Id.* The purpose of these requirements is to "assist the Court in focusing on the crucial portions of the record" in determining whether there is a genuine issue requiring a trial on the merits. *See* Advisory Committee Comment to Tenn. R. Civ. P. 56.03.

This Court has recognized that a nonmoving party's failure to comply with Rule 56.03 may result in the trial court's refusal to consider the factual contentions of the nonmoving party even though those facts could be ascertained from the record. *See Simmons v. Harris,* C/A No. M2000-00227-COA-R3-CV, 2000 WL 1586451, at *3 (Tenn. Ct.App. W.S., filed October 25, 2000), *perm. app. denied* April 16, 2001. As the United States Court of Appeals for the Seventh Circuit has noted, the statements of material facts filed by the parties on a motion for summary judgment

> are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923 (7th Cir.1994). Of course, a trial court, acting within its discretion, may waive the requirements of the rule in an appropriate situation, *see* *775 *Butler v. Diversified Energy, Inc.,* C/A No. 03A01-9804-CV-00146, 1999 WL 76102, at *3 (Tenn. Ct.App. E.S., filed January 28, 1999); however, considering the discretionary nature of the decision before us, we cannot say that the trial court in the instant case erred when it refused to waive the strict requirements of the rule, especially in light of the fact that the plaintiff's response to the defendant's statement of material facts and the memorandum of law in support thereof were not filed until the day before the hearing and could have been disregarded on that basis alone. *See* Tenn. R. Civ. P. 56.03 (requiring nonmoving party to file response no later than five days before the summary judgment hearing).

Furthermore, we cannot say that the trial court erred in denying the plaintiff's motion for a continuance. "An appellate court cannot interfere with the trial court's decision unless such decision constitutes an abuse of discretion and causes prejudice to the party seeking the stay or continuance." *Sanjines v. Ortwein and Assocs., P.C.,* 984 S.W.2d 907, 909 (Tenn.1998). The instant case is not merely a question of materials not being presented in the trial court's "preferred format," as suggested by the plaintiff. It is Rule 56.03 that sets forth the *required* format. The plaintiff failed to comply with that rule when he did not set forth in his response all of the facts that he contends are in dispute. The trial court acted within its discretion in choosing to strictly enforce those requirements.

*Owens v. Bristol Motor Speedway, Inc.*, 77 S.W.3d 771, 774-75 (Tenn.Ct.App.2001).

In once again reiterating the mandatory nature of the duty placed upon the non- moving party under Tennessee Rule of Civil Procedure 56.03, this Court held:

Although the trial court may, at its discretion, waive the requirements of the rule where appropriate, the court may also refuse to consider the factual contentions of a non-complying party even where such facts are ascertainable by the record. *Id.* Thus the material facts set forth in the statement of the moving party may be deemed admitted in the absence of a statement controverting them by the opposing party. *See* Robert Banks, Jr. & June F. Entman, Tennessee Civil Procedure, § 9– 4(i)(1999) (quoting *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 n. 1 (7th Cir.1995)). Accordingly, failure to file a response in opposition to a motion for summary judgment generally will prove fatal in the trial court and upon appeal. *See Mark VII Transp. Co. v. Belasco*, No. W2002-00450-COA-R3-CV, 2002 WL 31895714, at *4-5 (Tenn.Ct.App. Dec. 30, 2002) (*no perm app. filed.*).

*Holland v. City of Memphis*, 125 S.W.3d 425, 428-29 (Tenn.Ct.App.2003).

Looking to the undisputed material facts asserted by Defendants, the only written communication from McKellar to Cochran occurred on April 7, 2004, and when he was presented with these documents on April 19, 2004, Mr. Williams quickly recognized that they contained only a proposed parenting plan and a proposed order and not an effective restraining order. Plaintiff fails to present any factual basis upon which to predicate a duty owing from counsel for his former wife to him or any factual basis upon which to predicate any breach of such unestablished duty.[1]

Even if one disregards the statute of limitations defense, there is simply no basis upon which Plaintiff may assail the grant of summary judgment in this case.

The judgment of the trial court is in all respects affirmed, and costs of the cause are assessed to Appellant. The case is remanded to the trial court for such further proceedings as may be necessary.

_____
WILLIAM B. CAIN, JUDGE

---

[1]Mr. Williams asserts that he assumed he had been accused of some "vile act" involving his son but the record contains no proof of such an accusation.